# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ X
                                                             :
JIN FENG and YANG WANG (a/k/a HELEN          :          Case No. ——————————25-CV-
WANG),                                                       :          02396(NSR)(AEK)
                                                             :
                        Plaintiffs,                          :
                                                             :          **FIRST AMENDED COMPLAINT**
            vs.                                              :
                                                             :          Jury Trial Demanded
CHENCHEN FENG,                                               :
                                                             :
                        Defendant.                           :
                                                             X
------------------------------------------------------------

        Jin Feng ("Jin") and his wife Yang Wang (also known as "Helen," and together with Jin,

the "Plaintiffs") bring this action against their daughter, Chenchen Feng ("Chenchen" or

"Defendant"), to recover funds loaned to her for her medical school tuition and living expenses,

which she now misrepresents to be a gift in a heart-wrenching betrayal of her parents who

maintained a meager lifestyle so they could use their hard-earned cash to provide her and her sister

with opportunities that were never available to them as Chinese immigrants.

        As and for their Complaint herein, Jin and Helen hereby allege as follows:

                                    **NATURE OF THE ACTION**

        1.        Jin Feng and Helen FengWang have dedicated their entire lives to their children.

In 1994, when they were a young couple, Jin and Helen immigrated from China with only $750 to

their name.  At that time, Chenchen was only nine months old, and Jin and Helen were forced to

leave her behind with Helen's father in China so they could work to build a home here in the United

States.  Jin and Helen spent years toiling away at odd jobs, including delivering newspapers on the

weekends, and worked every single day of the week to save up money to build a foundation for

their family.  In 1998, Jin and Helen brought Chenchen over to live with them in the United States, where they raised Chenchen and, later, her younger sister Judy.

2.    Chenchen excelled in school.  Although Jin and Helen felt it was their parental duty to pay for their daughters' undergraduate education, they did not have enough money to also pay for their daughters' graduate degrees.

~~3.    When~~Nevertheless, when Chenchen decided to attend medical school, Jin and Helen ~~made an agreement with~~ wanted to try to help her.  ~~Jin and Helen would refinance their home and take~~ succeed.  Recognizing student loans ~~from other family members at~~ bore a ~~lower~~high interest rate ~~than that charged for school loans~~at the time, Jin and Helen made a verbal agreement with Chenchen to advance the costs of her medical school tuition and living expenses on the condition that Chenchen repay ~~their~~this loan once she became an attending physician.

~~4.~~3.    Chenchen ~~promised to repay the loan as~~ agreed ~~and, relying on that promise, Jin and Helen took on significant debt to help Chenchen with her medical school tuition and living expenses.~~.

4.    In reliance on Chenchen's promise, Jin and Helen budgeted for the additional expense of Chenchen's medical school tuition and living expenses and watched their spending, not partaking in the extracurricular activities that they wanted to do like playing tennis.  In addition, Jin and Helen had to extend the maturity date for a prior loan given to them by Helen's sister.  In 2012, Helen's sister loaned them $200,000 at 2% interest per annum because Jin and Helen needed the extra cash to help them pay for Chenchen's undergraduate tuition (as well as Judy's who attended college about two years later).  The original agreement was for Jin and Helen to repay Helen's sister in 2017, but Jin and Helen recognized that Chenchen would be starting medical school in 2016, and in recognition that they would be advancing the cost of Chenchen's tuition and

living expenses, Jin and Helen reached an agreement to extend the deadline by which they must pay Helen's sister from 2017 to 2020. Jin and Helen, thus, incurred the cost of paying additional interest to Helen's sister. Jin and Helen also made minimal contributions to their retirement plans because they needed the cash to help Chenchen with her medical school tuition and expenses.

5.      Initially, Chenchen was grateful for her parents' sacrifice and support. She repeatedly reaffirmed her obligation to repay the loan to Jin and Helen and promised to pay for Helen's health insurance until she qualified for Medicare. She also promised to take them on vacation and buy them luxury items like a boat and a new car and designer handbags that Jin and Helen would never dream of owning because they always put away their earnings towards their children.

6.      Chenchen's attitude changed after she got married and secured a position as an attending anesthesiologist at White Plains Hospital making over half a million dollars a year.

7.      On May 28June 3, 2024, after her parents cared for her for a month following the birth of her daughter, Chenchen took the position for the first time that she need not repay her parents' loan because nothing was in writing and that the loan was a gift. In other words, having received the benefit of her parents' loan that enabled her to get a medical degree, Chenchen decided that she wanted to keep her earnings for herself.

8.      Chenchen's breach has left her parents (and others) in a precarious financial situation. Jin and Helen used their hard-earned cash to help their daughters get opportunities they could only dream of, and they do not have sufficient savings to cover their own retirement.

9.      Making matters worse, Helen's mother and father have been ill, and Helen has been traveling to China to help care for her ailing and elderly parents. Chenchen, on the other hand, is well-aware of her grandparents' poor health, and yet, exhibits very little care or worry even though

Helen's father, Chenchen's grandfather, raised her for the first four years of her life in China when Jin and Helen were struggling to build a home in the United States. Indeed, Chenchen has refused to contribute to her grandparents' healthcare costs even after her grandfather was diagnosed with Stage 4 lung cancer and underwent hip replacement surgery.

10.    While Chenchen reaps the benefits of Plaintiffs' decades of sacrifice, she has left her parents highly vulnerable, desperate, and heartbroken as they begin what should be their golden years. Her actions are not only a selfish and disgraceful betrayal of her familial duty, but they constitute a breach of an enforceable loan agreement. Alternatively, Chenchen should be held liable to repay her parents under the equitable theories of unjust enrichment and promissory estoppel.

## **THE PARTIES**

11.    Plaintiff Jin Feng is an individual who is a citizen of the State of Connecticut. Jin Feng is married to Yang Wang a/k/a Helen Wang, and he is Chenchen Feng's father.

12.    Plaintiff Yang Wang a/k/a Helen Wang is an individual who is a citizen of the State of Connecticut. Helen Wang is married to Jin Feng, and she is Chenchen Feng's mother.

13.    Defendant Chenchen Feng is an individual who is a citizen of the State of New York who resides in Rye, New York. She is Jin Feng and Helen Wang's daughter.

## **JURISDICTION AND VENUE**

14.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because Plaintiffs are citizens of the State of Connecticut and Defendant is a citizen of the State of New York and the amount in controversy exceeds the sum or value of $75,000.

15.    The Court has personal jurisdiction over Defendant because she is an individual who is domiciled in New York.

16.     Venue is proper in this judicial district because Defendant resides in this judicial district, a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and Defendant is subject to the Court's personal jurisdiction in this judicial district with respect to this action.

## **FACTUAL ALLEGATIONS**

17.     Jin and Helen immigrated to this country from Nanjing, China in or around June 1994 seeking to build a better life for themselves and, far more importantly, for their family. They arrived with four suitcases and $750 to their name.

18.     Jin secured a position as a researcher at the University of Wisconsin making $19,600 per year while Helen worked numerous part-time jobs making minimum wage (which was around five dollars per hour at that time), including caring for seniors, cleaning lab equipment, and waiting tables.  Jin and Helen also delivered newspapers on the weekend to make ends meet.

19.     Their daughter Chenchen had been born the year before but, due to immense financial pressure, Jin and Helen were forced to leave Chenchen behind in Nanjing with Helen's father.

20.     Helen's father cared for Chenchen while Jin and Helen worked low wage jobs and slowly built a life for their family.

21.     Jin and Helen were devastated to leave their nine-month-old daughter behind but knew that it was the best decision for her future. Thankfully, at one point, Chenchen was able to visit Jin and Helen in Wisconsin for three months before returning to China.

22.     In 1995, Jin and Helen welcomed their second daughter Judy but, sadly, due to continuing financial pressure, were forced to send her to Shanghai to be raised by Jin's family while Jin and Helen continued to establish a life in America.

23.     In 1996, Jin and Helen moved to New York City where Helen found a job and Jin enrolled in a master's program for computer science because he believed it would offer him better job opportunities in the future.

24.     Those first years in the United States were the most difficult time in Jin and Helen's life.  Jin spoke very little English, their income was meager, and they rarely had a day off from work. Jin worked in the lab on Christmas Eve and Helen did not take a single day off for the first three years they lived in America.

25.     But they persevered and both earned master's degrees and secured green cards.

26.     By 1998, Jin and Helen had secured full-time jobs, and they rented a small apartment in Flushing, Queens.

27.     By then, to their immense joy, Jin and Helen had saved enough money to bring Chenchen over from China shortly before her fifth birthday.

28.     In January 2000, Jin, Helen, and Chenchen moved to Westport, Connecticut because the schools would provide a better education for their daughters.  Judy joined them that same year and their family was finally reunited.

29.     Jin and Helen could only afford a downpayment on the Westport home because, in 1996, while shopping on her lunch break for Christmas presents to send to Chenchen in China, Helen had been struck by a bicycle resulting in the loss of two front teeth, and she later received a settlement.

30.     Jin and Helen loved their daughters.  Everything Jin and Helen did was motivated by their desire to give them the best possible life.  Chenchen and Judy were their parents' entire world.

31.     Over the years, Jin and Helen lived an extremely modest life and saved most of their earnings in an education fund to pay for their daughters' undergraduate education.

32.     Chenchen always excelled in school.  She graduated high school with honors and got a perfect score on her SATs.  As a result of her academic performance, Chenchen received multiple opportunities for her undergraduate studies, including a full ride scholarship at the University of Connecticut, a partial scholarship at the University of Chicago, and a small scholarship at Duke University.

33.     Jin and Helen allowed Chenchen to choose where she attended and agreed to pay her tuition because they felt it was their duty as parents.  Chenchen chose to attend Duke University despite the smaller scholarship.

34.     Judy, Chenchen's younger sister, later followed Chenchen to Duke University.

35.     Jin and Helen were overjoyed at their daughters' opportunities, and they paid a total cost of approximately $400,000 for their undergraduate studies.

36.     Overall, Jin and Helen felt immense satisfaction that their move to a new country followed by decades of sacrifice had finally paid off and provided their daughters with opportunities they had never had.

37.     Chenchen and Judy both expressed their appreciation for Jin and Helen's sacrifice and promised to take care of their parents when they started earning salaries.

38.     Although Jin and Helen felt it was their obligation to pay for their daughters' undergraduate education, they ~~could~~did not ~~afford~~feel obligated to ~~also~~ pay for their graduate ~~school.~~education.  Nor could they afford to do so.  Jin and Helen repeatedly discussed this financial limitation with their daughters.

39.     Jin and Helen also did not want to treat one daughter more favorably than the other. At one point, ~~it became clear that~~ during her undergraduate studies, Judy decided she no longer wished to attend graduate school.  Jin and Helen believed that it would be unfair to pay for Chenchen's graduate studies (even if they could afford it) when Judy would not be getting the same benefit.  Indeed, Jin and Helen often reminded Chenchen that she would be obligated to pay back her medical school tuition and living expenses and told Judy that they would not treat their daughters differently.

40.     In March 2016, Chenchen received an offer to attend Tulane School of Medicine in New Orleans and raised the issue of medical school tuition and living expenses with her parents.

41.     At that time, the interest rate for student loans was more than 6 percent ~~whereas mortgage interest rates were less than 3 percent.~~.

42.     Jin and Helen could not afford to gift Chenchen the expense of graduate school, particularly right after paying for Chenchen *and* Judy's undergraduate tuitions at Duke University.

43.     At that time, Helen worked as a librarian and Jin worked for a non-profit college. They simply did not have the funds to cover graduate school tuition, too.

44.     Although Jin and Helen could not afford to pay for Chenchen's medical school tuition, they wanted to help her to incur the least amount of debt possible.

45.     Accordingly, in May 2016, Plaintiffs and Chenchen entered into a binding oral agreement.

~~46.~~     Jin and Helen offered to loan Chenchen the cost of her medical school tuition and living expenses ~~in exchange for Chenchen's agreement to repay that loan when she became an attending physician.~~

~~47.~~46.  ~~Chenchen agreed to repay Jin and Helen the cost of her medical school tuition and living expenses~~ so that she would not need to take out student loans at the higher interest rate in exchange for Chenchen's agreement to repay that loan when she became an attending physician, recognizing that she would be earning substantial sums at that time.

47.    Chenchen agreed to repay Jin and Helen the cost of her medical school tuition and living expenses..

48.    Relying upon Chenchen's representations, Jin and Helen agreed to loan her the money and Chenchen agreed that her repayments would begin when she became an attending physician after completing her residency program (the "Loan Agreement").

49.    This conversation took place in person at Jin and Helen's family home in Westport, Connecticut in or around May 2016.

50.    ~~Following that conversation, in reliance upon Chenchen's promise to repay the loan,~~ Jin and Helen ~~obtained $320,000~~used funds they freed up by refinancing their mortgage on their family home ~~that was charged at an interest rate of 2.875%.~~back in 2012.

~~51.    Also in reliance on Chenchen's promise~~In addition, Jin and Helen ~~borrowed another $200,000~~ extended the maturity date for a prior loan they obtained from Helen's sister Aya for $200,000 at ~~an~~2% interest ~~rate of 2%.~~

51.    ~~Also in reliance on Chenchen's promise,~~from 2017 to 2020.  Jin and Helen ~~stopped contributing money~~understood that incurring the additional interest payments at 2% was less than what Chenchen would have been charged from student loans.

52.    Jin and Helen also made fewer contributions to their retirement fund ~~and, instead, loaned that money,~~ opting to ~~Chenchen to cover her~~ use those funds towards Chenchen's medical school tuition and living expenses.

9

53.    Pursuant to the terms of the Loan Agreement, between 2016 and 2020, Jin and Helen loaned Chenchen a total of $437,233 to cover her tuition and living expenses while she attended medical school.

54.    Chenchen was at all times fully aware that Jin and Helen relied upon her representation that she would repay the loan.

55.    For several reasons, Chenchen knew at all times that the loan extended by her parents was not a gift.  *First*, Chenchen knew that Jin and Helen could not afford to give Chenchen that amount of money; Jin and Helen ~~borrowed against their home and also borrowed funds~~ had to extend the maturity date of an original loan obtained from Helen's sister by three years.  *Second*, Chenchen knew that it would have been unfair for Jin and Helen to give one daughter nearly half a million dollars without giving their other daughter the same amount and there was no question that Chenchen was aware Plaintiffs could not afford to gift her and Judy nearly one million dollars, particularly when she knew they did not put away enough funds for their own retirement.

56.    Using the loan from Jin and Helen, Chenchen was able to attend Tulane University School of Medicine in New Orleans beginning in 2016.  She graduated as a Doctor of Medicine in April 2020.

57.    In or around July 2020, Chenchen began her residency in anesthesiology at Mount Sinai Hospital in New York.

58.    Consistent with the terms of the Loan Agreement, Jin and Helen did not require Chenchen to repay her loan while she earned a modest resident's salary.  To make sure she was well taken care of, they would often drive to New York City to bring her food so she would eat well while working long hours.

59.     Helen and Jin continued to live a modest life and ~~paid off their mortgage and~~ the loan from Helen's sister in ~~2022.~~or about 2020.

60.     In or around October 2021, Chenchen's boyfriend (now husband), Andrew Li, visited Jin in Westport, Connecticut to ask for Chenchen's hand in marriage.  During that visit, Jin informed Andrew of the Loan Agreement and Andrew acknowledged that Chenchen would repay the loan as agreed when she became an attending anesthesiologist.

61.     Chenchen told Judy that after Andrew had that conversation with Jin, he asked Chenchen to sign a prenuptial agreement, further indicating that Chenchen and Andrew were fully aware that the loan was Chenchen's financial obligation and not a gift.

62.     Prior to her marriage to Andrew, Jin also reminded Chenchen of her obligations under the Loan Agreement ~~and~~.  Specifically, Jin made verbal comments in front of Helen, Judy, and Chenchen that Chenchen will not be treated differently than Judy and that Chenchen had an obligation to repay Plaintiffs for the amounts advanced towards her medical school tuition and expenses.  Chenchen agreed.

63.     Chenchen graduated from her residency program in May 2024 and secured a prestigious position as an attending anesthesiologist at White Plains Hospital beginning September 2024.  Her first-year salary was $500,000 plus a $100,000 signing bonus intended to help young physicians pay off their medical school loans.

64.     In or around April 2024, Chenchen gave birth to a daughter.  Jin and Helen cared for Chenchen and their granddaughter at their home in Westport for the first month after their granddaughter's birth.  In Chinese tradition called "Zuo Yue Zi," after a woman gives birth, she spends the first month at home in postpartum confinement to allow her body to rest and eat

nourishing foods.  Jin and Helen had also brought food down to New York City at least twice a month to ensure that Chenchen had nutritious food to eat while she was pregnant.

65.    On or around May 26, 2024, when "Zuo Yue Zi" was about to end, Jin and Helen raised the issue of the loan with Chenchen while they were at their home in Westport.  They told her that, as agreed, she would need to start repaying the loan when she started working as a full-time attending anesthesiologist at White Plains Hospital that fall.

66.    Chenchen, begrudgingly, acknowledged her obligations under the Loan Agreement and agreed to.  With a sour tone, she told her parents she will start paying back the loan in October 2024 when she expected to receive her signing bonus of $100,000 from White Plains Hospital.

67.    However, a few days later on June 3, 2025, despite expecting to earn in excess of $500,000 per year as an attending anesthesiologist, Chenchen reneged on the Loan Agreement and for the first time denied her obligation to repay any part of the loan.

68.    At no prior time had Chenchen ever denied the existence of the loan or her obligations under the Loan Agreement.  The term "gift" was never uttered in relation to Plaintiffs' payment of Chenchen's medical school tuition or living expenses until Chenchen reneged on her obligations for the first time on June 3, 2024.

69.    Upon information and belief, Andrew had demanded that Chenchen speak with an attorney before repaying the loan because he believed that Chenchen's money belonged to him and that any money repaid to Jin and Helen would not be available to him and his family.  Andrew previously referred to Chenchen (his own wife) as a "cash cow."" and made verbal statements in front of Jin and Helen about how he couldn't wait to count Chenchen's anesthesiologist's salary.

70.    Andrew's concern about money for his family and his and Chenchen's daughter is surprising, because unlike Jin and Helen when they were a young couple, Andrew and Chenchen

are not living a meager lifestyle.  Andrew is a principal of CC Capital, a private investment firm,

located in New York City, and has bragged to Jin and Helen about earning in excess of one million

dollars per year, asserting that he and Chenchen *each* fall within the top 1% of earners in the United

States.

71.    Upon information and belief, Andrew convinced Chenchen to speak with a friend

of his who is an attorney.

72.    Upon information and belief, Andrew's friend told Chenchen (incorrectly) that the

Loan Agreement is not enforceable because there was no written agreement and (also incorrectly)

that the loan is considered a gift that Chenchen is not legally obligated to repay.

73.    Based on this "legal advice," on ~~May 28~~or about June 3, 2024, Chenchen ~~told Helen
over~~ had a FaceTime ~~that~~with Plaintiffs where she ~~now~~told them she considered the money to be

a gift that she was not obligated to repay.   Unbeknownst to Plaintiffs, Chenchen ~~then~~secretly

recorded that conversation.  Upon information and belief, Chenchen did so because she wanted to

insert the concept that her medical school tuition and living expenses were a gift and to entrap her

father, Jin, into agreeing to the same, recognizing that English is not his primary language.   After

Helen made it clear on the call that it was not a gift, Chenchen walked away from the

~~phone~~conversation, leaving her mother devastated and in tears.

74.    Although Plaintiffs do not seek compensation for their parental duties, on countless

occasions, Jin drove Chenchen between Connecticut and Durham (when Chenchen was attending

Duke for undergraduate studies), Madison (where Chenchen's was working first job), and New

Orleans (when Chenchen was attending Tulane for medical school). Despite this (and numerous

other sacrifices over the years), ~~on that May 28, 2024 call,~~ Chenchen had the audacity to ask Jin

what he had ever "contributed" to her education and claimed that her accomplishments were solely the result of her own hard work. This callous and immature statement hurt Jin deeply.

75.    Chenchen has not spoken to Jin and Helen since walking away from the FaceTime call on ~~May 28~~June 3, 2024, despite numerous attempts by her family to reach out to her. Jin and Helen have tried to resolve this dispute with Chenchen, both with and without the aid of family members and lawyers. Unfortunately, Chenchen ignored their outreach.

76.    Chenchen's sister Judy, who supports her parents despite making a far lower salary than Chenchen, tried to convince Chenchen to pay back the loan and has gone so far as to offer to help Chenchen pay it back. ~~Chenchen refused this offer.~~Chenchen advised that she would speak to Andrew about Judy's offer. She later told Judy that she would not accept the offer.

77.    In a last-ditch effort, Jin and Helen provided a draft version of this Complaint to Chenchen in the hopes that Chenchen would be agreeable to resolving this family dispute without the need to go to Court. She refused.

78.    Chenchen's decision to breach the Loan Agreement and turn her back on her family has devastated Jin and Helen. After a lifetime of sacrifice to give their daughter the opportunity to achieve a level of comfort, security, and affluence they could only dream of, Chenchen has chosen to abandon them.

79.    Chenchen's breach of the Loan Agreement has also left Jin and Helen without sufficient assets to support Chenchen's grandparents in China, both of whom are elderly and depend upon their daughter to care for them. Helen's mother is 88 years old and has been bedridden for over four years. Helen's father (who raised Chenchen for the first four years of her life) is terminally ill with Stage 4 lung cancer and has incurred substantial medical expenses paid for by Jin and Helen.

80.    Both Helen's parents rely on Helen and Jin to be secure in their final stage of life.

81.    In sharp contrast, Chenchen's breach of the Loan Agreement has left Jin and Helen without sufficient assets to fund their fast-approaching retirement and left them highly vulnerable during what should be their golden years.

82.    After so much sacrifice, the least Jin and Helen expected of Chenchen was for her to honor her financial obligations even if she lacks any sense of familial duty or communal responsibility.

83.    Chenchen's heartless and disgraceful behavior is not only a breach of the Loan Agreement. It is a slap in the face to every immigrant who makes incalculable psychological, emotional and financial sacrifices so that their children do not have to.

84.    Chenchen's breach of the Loan Agreement has left Jin and Helen desperate, heartbroken, and forced to resort to the legal system to have ~~any chance at a secure future. Through~~enforce the benefit of their bargain.  Chenchen also knows her breach has caused Plaintiffs great distress.  A few months before she reneged on the Loan Agreement, Chenchen was aware that Plaintiffs had discussions with her husband Andrew, who has a finance background, about their rough financial state.

~~84.~~85.  Accordingly, through this action, Jin and Helen seek to enforce the terms of their Loan Agreement with Chenchen.  Alternatively, Jin and Helen seek to recover under the equitable theories of unjust enrichment and promissory estoppel.

## COUNT I: BREACH OF CONTRACT

~~85.~~86.  Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

~~86.~~87.  Chenchen is liable to her parents, Jin and Helen, for breach of contract.

~~87.~~88.  In May 2016, at their family home in Westport, Connecticut, Chenchen and Plaintiffs entered into the Loan Agreement.

~~88.~~89.  Plaintiffs offered to loan Chenchen the full amount of her medical school tuition and living expenses.

~~89.~~90.  In response, Chenchen represented that she would repay the full amount of the loan and that she would commence payments upon beginning work as an attending physician following completion of her residency program.

~~90.~~91.  In reliance upon Chenchen's representations, Plaintiffs agreed to the terms of the Loan Agreement.

~~91.~~92.  In reliance upon Chenchen's representations, Plaintiffs ~~took out a $320,000 home equity line~~obtained an extension of ~~credit from US Bank secured by their family home at a fixed interest rate~~the maturity date of ~~2.875%, borrowed $200,000~~a loan they previously obtained from Helen's sister ~~at an interest rate of 2%,~~for $200,000, charged at 2% interest, from 2017 to 2020, because they recognized that their funds would be used to pay Chenchen's medical school tuition and ~~stopped contributing to~~ expenses.  Plaintiffs also began to budget, spending less money on themselves for extracurricular activities such as tennis.  They also contributed minimal amounts towards their retirement ~~funds~~plans.

~~92.~~93.  In reliance upon Chenchen's representations that she would repay the loan, Plaintiffs transferred to Chenchen, or otherwise paid on her behalf, a total sum of $437,233 to pay her medical school tuition and living expenses.  This amount does not account for the interest that Plaintiffs ~~paid~~incurred to ~~obtain~~provide the ~~funds loaned~~loan to Chenchen.

~~93.~~94.  Jin and Helen fully performed their obligations under the Loan Agreement.

94.95.  On numerous occasions between 2016 and 2024, and as recently as May 26, 2024, Chenchen reaffirmed and acknowledged her obligations under the Loan Agreement and agreed to repay the loan.

95.96.  At all times Chenchen knew that the loan was not a gift because she knew that Plaintiffs could not afford to pay for her medical school tuition and, for that reason, Plaintiffs borrowed the funds from their mortgage lender and Helen's sistergiven their rough financial state.

96.97.  Nonetheless, on May 28June 3, 2024, Chenchen told Helen for the first time that she considered the loan to be a "gift" and that she was under no obligation to repay any of the loan amount.  At no time prior to this date did any party use the term "gift" in relation to Chenchen's medical school tuition or living expenses.

97.98.  Chenchen became an attending anesthesiologist at White Plains Hospital in or around September 2024, making over half a million per year, but refused to repay any of the loan notwithstanding her obligation to do so under the terms of the Loan Agreement.

98.99.  Accordingly, Chenchen is in breach of the Loan Agreement.

99.100.      As a result of Chenchen's breach of the Loan Agreement, Plaintiffs have been damaged in an amount to be determined at trial, which shall in no event be less than the amount loaned of $437,233, plus interest, plus attorneys' fees.  This balance will continue to grow with interest with each passing day until it is paid.

## COUNT II: UNJUST ENRICHMENT

100.101.      Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

101.102.      In the alternative to breach of contract, Chenchen is liable to Jin and Helen for unjust enrichment.

17

102.103.　　　Plaintiffs could not afford to pay for Chenchen's medical school tuition and expenses. To help Chenchen, Plaintiffs agreed to loan her $437,233 towards medical school tuition and living expenses.

103.104.　　　Chenchen benefited from this loan because it allowed her to graduate from medical school and, ultimately, earn a lucrative salary as an attending anesthesiologist giving her, her husband, and her daughter substantial financial security.

104.105.　　　Chenchen also benefited from this loan because it allowed her to pay her medical school tuition and expenses at a lower rate of interest than the prevailing interest rate charged for student loans.

105.106.　　　Chenchen expressly and unequivocally agreed to repay the loan to the Plaintiffs in May 2016, repeatedly between 2016 and 2024, and as recently as May 26, 2024.

106.107.　　　Nonetheless, Chenchen now refuses to repay Plaintiffs for the benefit they conferred upon her and has therefore been unjustly enriched in the amount of at least half a million dollars, equal to the principal amount loaned of $437,233 plus interest.

107.108.　　　Chenchen's unjust failure to repay Plaintiffs has been detrimental to Plaintiffs in that it has harmed Plaintiffs' ability to care for Helen's ailing parents and depletedimpaired Plaintiffs' financial wherewithal for retirement savings right before Plaintiffs plan to retire.

108.109.　　　It is contrary to equity and good conscience for Chenchen to retain the financial benefit that has come to her at the expense of the Plaintiffs. Chenchen used the Plaintiffs' loan to secure an affluent future for herself while leaving the Plaintiffs financially insecure at a vulnerable time in their life despite decades of hard work and sacrifice for their daughter.

18

109.110.        Accordingly, Chenchen should be required to remit payment to Plaintiffs of an amount to be determined at trial, which shall in no event be less than the amount loaned of $437,233, plus interest, plus attorneys' fees.  This balance will continue to grow with interest with each passing day until it is paid.

### COUNT III: PROMISSORY ESTOPPEL

110.111.        Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

111.112.        In the alternative, Chenchen is liable to the Plaintiffs for promissory estoppel.

112.113.        In or around May 2016, Plaintiffs offered to loan Chenchen $437,233 to pay for medical school tuition and expenses so long as Chenchen promised to repay the loan when she became a full-time attending physician.

113.114.        Chenchen made a clear and definite promise to repay Plaintiffs the full amount of the loan when she became a full-time attending physician.

114.115.        Chenchen reasonably expected her promise of repayment to induce Plaintiffs to loan her $437,233 to pay for medical school tuition and expenses.

115.116.        Plaintiffs relied on Chenchen's promise of repayment when they decided to borrow additional money against.  They extended the family home, borrow moneymaturity date of a loan for $200,000 charged at 2% interest obtained from Helen's sister at a rate of 2% interest, and to stop contributingfrom 2017 to 2020.  They also made minimal contributions to their retirement accounts.

116.117.    Plaintiffs relied on Chenchen's promise of repayment when they transferred, or otherwise paid on her behalf, $437,233 to pay for medical school tuition and expenses.

117.118.    Plaintiffs' reliance on Chenchen's promise of repayment was reasonable because she had always been a kind and gracious daughter who understood the decades of sacrifice Plaintiffs made on her behalf.

118.119.    Chenchen's promise of repayment induced Plaintiffs to loan Chenchen $437,233 to pay for medical school tuition and expenses.

119.120.    Plaintiffs incurred a detriment as a result of relying on Chenchen's promise because they now lack sufficient funds to care for Helen's ailing parents or to retire securely.  Helen is also being forcedplans to retire from her job in or around June 2025September 2025 (before she turns 65 years old) so that she can return to China to care for her aging and sick parents.  As a result, she will lose the income she currently relies upon to pay for her parents' medical expenses in China.

120.121.    Chenchen's promise of repayment must be enforced to prevent an unjust outcome. Chenchen induced Plaintiffs to loan her money that allowed her to secure an affluent future for herself. If that promise is not enforced, Plaintiffs will be left without the means to retire securely or care for Helen's ailing parents.

121.122.    Accordingly, Plaintiffs are entitled to damages in an amount to be determined at trial, which shall in no event be less than the amount loaned of $437,233, plus interest, plus attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests relief and judgment against Defendant as

follows:

(A)    In connection with Count I for Breach of Contract, awarding Plaintiffs monetary damages against Defendant in an amount to be determined at trial but shall in no event less than $437,233 plus interest plus attorneys' fees;

(B)    In connection with Count II for Unjust Enrichment, awarding Plaintiffs monetary damages against Defendant in an amount to be determined at trial, but shall in no event less than $437,233 plus interest plus attorneys' fees;

(C)    In connection with Count III for Promissory Estoppel, awarding Plaintiffs monetary damages against Defendant in an amount to be determined at trial, but shall in no event less than $437,233 plus interest plus attorneys' fees;

(D)    For pre-judgment and post-judgment interest at the maximum rate permitted by law;

(E)    For Plaintiffs' attorneys' fees and costs of collection;

(F)    For such other, different, and further relief as may be just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:    ~~March 24,~~July ____, 2025        Respectfully submitted,
          New York, New York

                                            **MELISSA YANG PLLC**

                                            By: _____
                                                Melissa Yang
                                            136 Madison Avenue, 6th Floor
                                            New York, NY 10016
                                            Tel: (646) 516-9529
                                            myang@melissayangpllc.com

                                            *Attorneys for Plaintiffs Jin Feng and*
                                            *Yang Wang*

